UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Jeri Ording,                                    Civil No. 11-CV-2296 (MJD/LIB)

        Plaintiff,

v.                                              **REPORT AND RECOMMENDATION**

Michael J. Astrue, Commissioner of the
Social Security Administration,

        Defendant,

---

    Jeri Ording[1] (Plaintiff) seeks judicial review of the decision of the Commissioner of

Social Security (Defendant) denying her application for disability insurance benefits (DIB) and

supplemental security income (SSI).  The matter was referred to the undersigned United States

Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule

72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3).  Both parties submitted motions for summary judgment.  For the reasons set forth

below, the Court recommends that Plaintiff's motion for summary judgment be granted in part

and Defendant's motion for summary judgment be denied.

    **I.**      **BACKGROUND**

    **A.  Procedural History**

    Plaintiff filed her application for DIB and Title XVI application for SSI on November 3,

2008[2], alleging a disability onset date of January 1, 2000.[3]  (Tr. 126-34).[4]  Her application was

---

[1] At the time of her application, Plaintiff's name was Jeri L. Heckman.
[2] Plaintiff's application was filed on November 7, 2008; however, she had a protective filing date of November 3, 2008.
[3] Plaintiff had also previously filed an application for DIB and SSI on November 28, 2007, alleging a disability onset date of January 1, 2004.  (Tr. 119-125).

denied initially and upon reconsideration.  (Tr. 71-75, 80-83).  Upon Plaintiff's request for a

hearing, Administrative Law Judge George Gaffaney (ALJ) held a hearing on September 13,

2010.  (Tr. 19).  The ALJ denied Plaintiff's claim on December 3, 2010.  (Tr. 18).  The ALJ

found that from the date of her application through the date of his decision, Plaintiff was not

disabled within the meaning of the Social Security Act.  (Tr. 18).  Plaintiff sought review of the

decision by the Appeals Council.  (Tr. 5).  Because the Appeals Council denied Plaintiff's

request for review, (Tr. 1-4), the ALJ's decision became the final decision of the Commissioner.

See 20 C.F.R. §§404.981, 416.1481.

**B.  Factual History**

Plaintiff was 56 years old at the time that she filed her application.  (Tr. 119).  Although

she did not graduate from high school, she has a GED.  (Tr. 25).  She has been married six times

and has six children.  (Tr. 23, 36).  She has not had any substantial employment in the past 15

years.  (Tr. 22-23).  She lives by herself.  (Tr. 26).  However, she has a friend that comes over

about once a month to help her clean.  (Tr. 161).  Although her friend, Harry Bailey, helps

Plaintiff with vacuuming and laundry, (tr. 161), according to Mr. Bailey, Plaintiff is sometimes

able to clean and do laundry.  (Tr. 210).  Plaintiff is also able to do daily chores during

commercials when she is watching television.  (Tr. 208).  Mr. Bailey also stated that he has seen

her sitting on the couch with extra pillows because of her back pain.  (Tr. 161).  According to

Mr. Bailey, Plaintiff has no problems with personal care, though she needs to be reminded about

showering from time to time.  (Tr. 209-10).  Plaintiff is able to prepare daily meals for herself.

(Tr. 210).

---

[4] Throughout this Report and Recommendation, the Court refers to the administrative record [Docket No. 7] for the present case by the abbreviation "Tr."

At the hearing, Plaintiff stated that she is unable to work because she is bipolar and because of lower back pain. (Tr. 26). She provided that she is only able to walk for about a block before she gets "very, very, very hurt and tired." (Tr. 26). With regard to her back, however, she provided that she has not sought much treatment because she mostly lives a sedentary life. (Tr. 30-31). She has no pain in her back when she is sitting down, but walking, bending, lifting, stretching, and even standing for lengthy periods of time give her pain. (Tr. 30-31). She also provided that she does not feel comfortable around other people, and when she is in public, she gets paranoid. (Tr. 35).

Both Plaintiff and Mr. Bailey addressed Plaintiff's difficulty in dealing with any stress. Plaintiff provides that she has a very low tolerance for stress. (Tr. 196). Mr. Bailey also stated that Plaintiff does not handle stress well at all. (Tr. 214). At the hearing Plaintiff testified that her tolerance for stress was not good, she wants to start yelling at people when she gets stressed. (Tr. 38). When asked if she could perform a full time job, she testified that "it's too stressful to have to be on a schedule like that." (Tr. 39). On her inability to handle stress, on a scale of 1 to 10, she provided that it was a 10. (Tr. 232).

Despite her impairments, she admits that she is capable of doing a variety of activities and tasks by herself. Although she doesn't always "keep the house as clean as [she] should," she is able to do some cleaning by herself. (Tr. 36, 41). She enjoys watching the food channel and sitting on her porch. (Tr. 36-37). She is capable of going to the grocery store by getting on a bus, but she only does so about once a week. (Tr. 40). Other than going to her doctor appointments and shopping once a week, she does not leave her home much. (Tr. 194).

**C.  Medical Evidence for the Relevant Time Period**

Plaintiff alleges that she is disabled because of physical and mental impairments.  The medical history for each is discussed independently.

**a.  Physical Health Medical Evidence**

On April 19, 2004, upon reports of low back pain, Plaintiff received an x-ray of her spine. (Tr. 395).  It showed mild curvature convex right, some degenerative disc degeneration between L4-5, mild spurring and some facet spurring in the lower lumbar spine, and that the SI joints and visualized hip joints were normal.  (Tr. 395).  Otherwise, the findings were "essentially negative."  (Tr. 395).

On August 16, 2004, Plaintiff sought treatment for right neck and shoulder pain, which she had been experiencing for three weeks.  (Tr. 386).  An examination of her neck and shoulders revealed "good range of motion in all directions of the neck but pain when turning to the right."  (Tr. 386).  Plaintiff was "tender through the upper trapezius and along the medial side of her scapula."  (Tr. 386).  However, she had "[f]ull range of motion of the shoulder without pain."  (Tr. 386).  She was advised to stop smoking and begin more regular exercise.  (Tr. 387).

During a December 16, 2004, evaluation for hyperkalemia, she was found to have normal reflexes in upper and lower extremities and normal strength and coordination.  (Tr. 385).

On February 21, 2005, Plaintiff experienced some right knee pain, which became worse with walking up and down stairs.  (Tr. 382).  She was found to have no acute injury, swelling, redness, or weakness.  (Tr. 382).  Upon examination of the right knee, it was found to be "[c]ompletely normal other than tenderness on the superior and medial pole of her patella."  (Tr. 382).  There was no "grinding, crepitus, or evidence of weakness or instability."  (Tr. 382).  She

was advised about icing, anti-inflammatories, and exercise and told to seek follow-up if not better.  (Tr. 382).

On February 7, 2008, Plaintiff underwent an orthopedic musculoskeletal examination with Matthew S. Harrison, M.D.  (Tr. 287).  She was referred for the examination because she reported that she experienced chronic intermittent low back pain.  (Tr. 287).  However, during the examination, she complained "primarily of her mental health issues," and did "not make much of her low back complaints."  (Tr. 287).  She stated that "she currently ha[d] no pain, at her worst she ha[d] no pain and at her best she ha[d] no pain."  (Tr. 287).  Although she informed Dr. Harrison that she believes she had "some osteoarthritis in her lumbar spine," she "denie[d] any discomfort or deformity in any of her major joints or her lower limbs."  (Tr. 287).

Upon examination, Dr. Harrison found that Plaintiff's range of motion in the knees, hips, and ankles were all normal, she had "no evidence of enlargement effusion, tenderness, swelling or any evidence of deformity of the lower limbs," her low back had no evidence of deformity, and she was able to perform all stretch and reflex tests satisfactorily.  (Tr. 287).  She did, however, have some tenderness with deep palpation in the paralumbar muscles.  (Tr. 287).  Her range of motion at the low back was 80 degrees of flexion at the lumbar spine and 5 degrees of extension with side bending at 10 degrees bilaterally.  (Tr. 287).

Dr. Harrison estimated that Plaintiff's ability to sit in an eight hour day was three to four hours in duration with breaks, which Plaintiff agreed with.  (Tr. 287).  Dr. Harrison stated that Plaintiff could only stand 15 minutes before she would need to sit, but he did not cite to any data or tests he performed to reach that conclusion and appeared to base that statement on Plaintiff's subjective complaint.  (Tr. 287).  He found that she had "some posterior element arthropathy in the lumbar spine but [that] this [did] not cause significant limitation to her."  (Tr. 288).

On September 19, 2008, Plaintiff underwent a physical examination by Peter A. Wodrich, M.D. (Tr. 377). During the examination, Plaintiff reported that she had been drinking 3 tall beers a day and more on the weekends. (Tr. 377). Other than some diarrhea, she had no significant complaints and had no musculoskeletal complaints, clubbing, cyanosis, or edema. (Tr. 377). Dr. Wodrich described her neck as supple without adenopathy, no carotid bruit or JVD. (Tr. 378). Dr. Wodrich recommended that she stop drinking and smoking, and increase her physical activity. (Tr. 378).

On December 29, 2008, Jeffrey D. Gorman, M.D., a state agency medical consultant, made a physical residual functional capacity assessment of Plaintiff. (Tr. 332). He found the following exertional limitations: occasionally lifting 50 pounds, frequently lifting 25 pounds, standing or walking (with normal breaks) for a total of about 6 hours in an 8-hour workday, sitting (with normal breaks) for a total of about 6 hours in an 8-hour workday, and no limitation for pushing or pulling other than as noted in the other limitations. (Tr. 333). He found no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environment limitations. (Tr. 334-36). He based his findings on Dr. Harrison's examination performed on February 7, 2008. (Tr. 333). However, he reached a contrary conclusion to that of Dr. Harrison because, according to Dr. Gorman, the conclusion Dr. Harrison reached "regarding standing was based entirely on the [history] given by [Plaintiff]" and Plaintiff's "back exam was essentially normal except for some tenderness with deep palpation in the paralumbar muscles." (Tr. 338). On April 16, 2009, Eames Sandra, M.D., a state agency medical consultant, affirmed Dr. Gorman's assessment. (Tr. 356-58).

On August 22, 2009, Plaintiff made a visit to the emergency room after an assault in which she was kicked in her left ear and punched in her arms and chest. (Tr. 366). Brent L.

Crabtree, M.D., Plaintiff's physician, noted that Plaintiff had a hematoma over her left ear, some bruising on her left upper humeral area and her hand, but no cervical spine tenderness, no signs of head trauma, no chest wall tenderness.  (Tr. 366).  She declined treatment for the hematoma and declined to have a CAT scan.  (TR. 367).  She was discharged in stable condition.  (Tr. 367).

On November 4, 2009, Plaintiff went to urgent care and saw Thomas E. Kunze, M.D. for neck pain she was experiencing.  (Tr. 364).  She provided that her neck was very stiff and that she had not yet tried any medication to help ease the pain.  (Tr. 364).  Dr. Kunze observed tenderness diffusely over the posterior neck, worse on the left than the right, tightness and tenderness in the left musculature, and that she had difficultly turning her head to either side.  (Tr. 364).  Dr. Kunze believed that the neck pain could be a recurrence of her torticollis, which Plaintiff provided she had two years prior.  (Tr. 365).  She was prescribed Toradol and Lortab, discharged and referred to physical therapy.  (Tr. 364).

On November 21, 2009, Plaintiff visited the emergency room and received treatment from Christopher R. Delp, M.D. for neck pain she was experiencing.  (Tr. 362).  Plaintiff reported her neck pain as a 9 out of 10, which was worse with movement.  (Tr. 362).  She explained that the pain began in her sleep the previous morning.  (Tr. 362).  She also stated that Flexeril and Lortab resolved her neck pain in the past and asked that she be given something to help loosen up her neck.  (Tr. 362).  Dr. Delp found no associated numbness, tingling, or weakness.  (Tr. 362).  He observed some diffuse tenderness up and down her neck but found nothing else to be abnormal.  (Tr. 362).  He also noted that Plaintiff did not want "any x-rays or any sort of an evaluation of her neck."  (Tr. 362).  Dr. Delp prescribed her some Lortab and Flexeril and discharged her in stable condition.  (Tr. 363).

On November 23, 2009, Plaintiff was seen by Peter A. Wodrich, M.D. for the neck pain she had been experiencing for the previous two weeks. (Tr. 371). She represented that she experienced pain when she turned her head to either side or tilted it forward. (Tr. 371). She provided that she was beginning to exercise at a local fitness center and was finding herself fatigued with little exercise. (Tr. 371). Dr. Wodrich found some posterior tenderness especially around the occiput and in the upper trapezius bilaterally, but noticed no adenopathy. (Tr. 371). He opined that the fatigue with exercise was likely due to deconditioning. (Tr. 371). He noticed no other issues and referred Plaintiff to "physical therapy for her neck as well as for ongoing back pain."

### b. Mental Health Medical Evidence

On September 15, 2005, Joseph J. Sivak, M.D, Plaintiff's primary health professional, provided a medical opinion form, in which he checked a box that Plaintiff "will not be able to perform any employment in the foreseeable future." (Tr. 290). Other than listing Plaintiff's conditions, however, Dr. Sivak included no explanation for his opinion. Plaintiff had a long-standing relationship with Dr. Sivak from March of 2004 until August of 2007, when she was "discharged for non-compliance, for not coming to appointments." (Tr. 299). She then again resumed her visits with Dr. Sivak in November of 2008, as more fully discussed below. (Tr. 299).

On February 3, 2008, Marlin Trulsen, Ph. D., LP, performed a consultative examination on Plaintiff. (Tr. 279). During the interview, Plaintiff provided that although she had psychological counseling in the past, at the time, she was not undergoing any psychological counseling and had not taken any psychiatric medication for six months. (Tr. 280). She also stated that she was going through a divorce at the time. (Tr. 281). Other than Hepatitis C, she

8

reported no significant medical issues. (Tr. 281). With regard to her daily functioning, Plaintiff provided that most of her day was spent watching television or sleeping. (Tr. 281). She would be able to run errands and clean-up when necessary. (Tr. 281). She stated that she was "capable of doing her own cleaning, shopping, dishes, cooking and laundry." (Tr. 281). She reported "an adequate level of social life and social acquaintances." (Tr. 281).

After an examination, Dr. Trulsen concluded that Plaintiff's "frustration tolerance appeared developed somewhat below age-level expectations." (Tr. 282). Although she appeared alert and oriented, her "judgment and insight appeared developed somewhat below age-level expectations." (Tr. 282). Her overall intellectual functioning was in the average range. (Tr. 284). He estimated her IQ to be in the average range. (Tr. 283). Dr. Trulsen also found that she had "[a]dequate general memory skills and long-term memory observed for daily living skill needs," but stated that she may have significant difficulties with working memory skills, especially in relation to numerical processing, as she was unable to complete the "serial 7s" assessment. (Tr. 283-84). "Her general mental capacity for remembering, following instructions, sustaining attention, and concentrating appeared to be within an average to low average range . . . but that as she becomes familiar and there is less detail, she likely easily functions within an average range." (Tr. 283). He found that Plaintiff's "general mental capacity to respond appropriately to brief and superficial contact with coworkers and supervisors likely appears to be currently within a low average to borderline range of ability as is her ability to tolerate stress and pressures typically found in an entry level workplace." (Tr. 284). Once again, though, they would "likely improve to an average to low average range with improved symptom profile management." (Tr. 284). Dr. Trulsen assigned Plaintiff a GAF score of 55. (Tr. 284).

On November 11, 2008, Plaintiff visited Troy D. Otterson MSW, LGSW for a diagnostic assessment.  (Tr. 295).  She was diagnosed with Bipolar Disorder, Posttraumatic Stress Disorder, and Borderline Personality Disorder.  (Tr. 295).  She was assigned a GAF score of 45.  (Tr. 295).  Her social functional impairment was listed as moderate, and her self-care functional impairment was listed as moderate.  (Tr. 296).

On November 24, 2008, Plaintiff returned to Dr. Sivak for a diagnostic evaluation.  (Tr. 299).  Plaintiff's chief complaint was that she was not able to sleep and was not able to get out of bed.  (Tr. 299).  She provided that she had not been taking medications since March of 2007 and that she had gained 30 to 40 pounds.  (Tr. 299).  She had recently found a new boyfriend, with whom she planned to go to Florida.  (Tr. 299).  Dr. Sivak noted her behavior as "[g]enerally in control" and cooperative, her speech as slightly rapid, her mood as depressed, her affect as slightly energized and expansive, and her thought form as "[r]apid flow, clear, concise and logical."  (Tr. 300).  He diagnosed Plaintiff with Bipolar NOS, PTSD by history, history of polysubstance abuse, mixed personality disorder with borderline histrionic and histrionic trains, and he assigned her a GAF score of 45.  (Tr. 301).  He prescribed Topamax and Benadryl.  (Tr. 302).

In December of 2008, Dr. Sivak noted that Plaintiff was sleeping a bit better and that Plaintiff felt calmer.  (Tr. 422).

On December 23, 2008, Chang-Wuk Kang, M.D., provided a mental residual functional capacity (RFC) assessment for Plaintiff's condition from November 3, 2008 to the date of the assessment.  (Tr. 307).  He found that the medical categories for which Plaintiff sought disability were 12.04, 12.08, and 12.09.  (Tr. 307).  Dr. Kang provided that Plaintiff had no significant limitation in understanding and memory, no significant limitation for sustained concentration and

persistence, with the exception of the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, which he found to be moderately limited.  (Tr. 321-22).  With respect to social interaction, Dr. Kang concluded that Plaintiff had moderate limitations in interacting appropriately with the general public but no significant limitations in any of the other categories.  (Tr. 322).  Similarly, with respect to adaption, Dr. Kang found that Plaintiff had moderate limitation in the ability to respond appropriately to changes in the work setting but no significant limitations in the rest of the abilities within that category.  (Tr. 322).  Thus, for "paragraph B criteria," Dr. Kang assessed that Plaintiff had no restriction of activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulty in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration.  (Tr. 317).  He found no marked limitations in any category.  (Tr. 317).  He found that Plaintiff's mood disorder, NOS, history of a substance abuse and personality disorder, NOS were severe but did not meet or equal the listing of 12.04, 12.08 or 12.09.  (Tr. 306).  He explained that Plaintiff's "mental residual functional capacities reveal[ed] that [she] ha[d] no problem in following instructions, she [would] have minimal limitation in concentration and persistence to complete workdays and workweeks, she [would] have substantial limitation in dealing with general public but [that] she [could] interact otherwise and her adjustment [was] minimally limited."  (Tr. 306).  On April 16, 2009, James M. Alsdurf, Ph. D., LP, a state agency medical consultant, affirmed Dr. Kang's assessment.  (Tr. 353-55).

From December of 2008 through April of 2009, Plaintiff underwent psychotherapy treatment by Mr. Otterson.  (Tr. 341-52).  On December 8, 2008, Mr. Otterson observed

increased depression and labile mood.  (Tr. 341).  On January 8, 2009, Mr. Otterson found

Plaintiff's symptoms to be mood swings and racing thoughts.  (Tr. 342).  On January 29, 2009,

he observed labile moods.  (Tr. 343).  In February of 2009, Plaintiff reported that she was the

victim of verbal and emotional abuse but refused a referral to agencies that may be able to assist

her.  (Tr. 344).  On February 26, 2009, she reported an incident in which the police were called

to her home and her boyfriend was kicked out.  (Tr. 347).  She provided that she was "doing ok

with it."  (Tr. 347).  On March 3, 2009, Mr. Otterson made similar findings.  (Tr. 348).  On

March 12, 2009, Mr. Otterson noted elevated depression and nightmares and described that

Plaintiff's boyfriend was attempting to have continued contact with her.  (Tr. 349).  He advised

her where she could seek help for the abuse.  (Tr. 349).  Mr. Otterson continued to make similar

findings through April 9, 2009.  (Tr. 350-52).  Furthermore, throughout all these sessions, Mr.

Otterson noted a checkbox that Plaintiff was progressing and improving.  (Tr. 341-49).

On May 27, 2009, Dr. Sivak again noted that Plaintiff was sleeping better and that her

mood, as described by Plaintiff, was "fine."  (Tr. 416).  On July 20, 2009, Dr. Sivak noted that

Plaintiff's affect and mood were well-controlled.  (Tr. 414).  On November 23, 2009, Dr. Sivak

described her affect as calm and her mood as stable and noted that she was sleeping and eating

"okay."  (Tr. 406).  On December 21, 2009, Plaintiff's affect was noted as expansive and

irritable.  (Tr. 405).  On January 18, 2010, Dr. Sivak again reported that Plaintiff was sleeping

better, her mood was well-controlled and she had good affect.  (Tr. 404).  She was calm and

pleasant.  (Tr. 404).  On February 17, 2010, Dr. Sivak noted that Plaintiff was doing well on

Seroquel and Topamax.  (Tr. 403).  On May 3, 2010, Plaintiff's mood was well-controlled but

she presented with borderline chaos regarding medication doses.  (Tr. 399).

On April 2, 2010, Mr. Otterson described Plaintiff as presenting bright and noted her mood as "good." (Tr. 439). Her affect was euthymic. (Tr. 439). On April 8, 2010, her mood was "alright" and her affect again euthymic. (Tr. 437). On April 29, 2010, Plaintiff arrived in significant distress over issues with her boyfriend. (Tr. 435). She described her mood as "upset," and Mr. Otterson described her affect as depressed. (Tr. 435). On May 12, 2010, her mood was noted as "going crazy" and she was advised to pursue an order of protection from her boyfriend. (Tr. 434). On May 26, 2010, Plaintiff was stressed and worried, again because of issues with her boyfriend, and Mr. Otterson described her affect as depressed. (Tr. 433). He noted that she continued to be at "significant risk for hospitalization." (Tr. 433). On July 21, 2010, Mr. Otterson described Plaintiff as upset and noted that Plaintiff was not coping well without regular therapy. (Tr. 430). Her affect was labile. (Tr. 430). On August 18, 2010, her affect was again labile. (Tr. 429). Throughout her treatment in 2010, Mr. Otterson described Plaintiff's attitude, behavior, appearance, and speech as normal and appropriate. (Tr. 429-39). She consistently had clear, concise, and logical thought, though she continually exhibited minimal judgment and insight. (Tr. 429-39).

On August 31, 2010, Dr. Sivak, provided an evaluation regarding her mental functional limitations, in which he was asked to describe Plaintiff's capabilities as "little or no difficulty," "occasional difficulty," "occasionally unable," or "frequent unable." (Tr. 423). Each category was defined as follows: little or no difficulty: "[t]he individual would be able to satisfactorily complete the job activity up to 90% of the time"; occasional difficulty: "[t]he individual would have difficultly satisfactorily completing the job activity up to one-third (2-3) hours of an eight hour workday"; occasionally unable: "[t]he individual would be unable to satisfactorily complete the job activity up to one-third (2-3) hours of an eight hour workday"; frequently unable: "[t]he

individual would not be able to satisfactorily complete the job activity up to two-thirds (5-6 hours) of an eight hour workday."  (Tr. 423).

Under "paragraph B criteria," in evaluating Plaintiff's understanding and memory, Dr. Sivak provided that Plaintiff would be occasionally unable to remember work-like procedures, she would have occasional difficulty with understanding and remembering short, simple instructions, and would be frequently unable to understand and remember detailed instructions. (Tr. 423).  In evaluating Plaintiff's sustained concentration and persistence, Dr. Sivak noted that she would be frequently unable to carry out and sustain most of the categories, with the exception of carrying out very short and simple instructions, maintaining attention and concentration for extended periods of time, and working in coordination with or proximity to others without being distracted by them, which he characterized as "occasionally unable."  (Tr. 424).  With regard to Plaintiff's social interaction and adaption, Dr. Sivak again noted most of the categories as "frequently unable."  (Tr. 425).  He explained that Plaintiff suffers from severe post-traumatic stress disorder, personality disorder, and mood disturbance.  (Tr. 423).  He provided that she would be unable to consistently respond to direction, structure and instruction without significant anxiety.  (Tr. 423).  He believed that she would be extremely anxious and disruptive to any work environment.  (Tr. 423).  In considering "paragraph C criteria," he found that Plaintiff had "a residual disease process (mental impairment) that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate."  (Tr. 426).  He further noted that because of Plaintiff's impairments, even minor stresses in environment result in chronic severe anxiety and depression bordering on suicidality and self-destructive actions. (Tr. 426).

Based on his evaluation, Dr. Sivak concluded that Plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked deficiencies in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation, each of extended duration.  (Tr. 427).

### D.  Evidence from the Vocational Expert

Vocational expert, Edward Utitis, testified at the administrative hearing regarding what jobs exist in the region and whether Plaintiff would be suitable for any such jobs.  (Tr. 42-46). Because the ALJ found that Plaintiff had no past relevant work, (Tr. 23), the ALJ did not make any inquiry on whether Plaintiff could perform past relevant work based on her impairments. Instead, the ALJ framed a hypothetical person and asked whether such a person could do some work available in the economy.  The hypothetical person he described was an individual 55 years old, with high school equivalent education, who could lift "fifty pounds occasionally, twenty-five frequently, stand and sit six hours each in the eight-hour work day, limited to simple, routine tasks with just occasional interaction with the public."  (Tr. 43).  The vocational expert provided that the hypothetical person could perform the more than 8,000 jobs as hand packager or more than 4,000 jobs as machine packager available in the state of Minnesota.  (Tr. 43).  Both of the jobs were classified as "medium, unskilled, simple, routine, repetitive jobs with no contact with the public."  Plaintiff's counsel then examined Mr. Utitis and asked if those jobs could still be performed by someone who had the impairments and limitations described by Plaintiff's treating psychiatrist, Dr. Sivak, in Exhibit B22F, such that the person is

> unable to satisfactorily complete the job activity up to two-thirds of an eight-hour work day, that she would frequently be unable to perform such basic functional abilities as performing activities within a schedule, maintaining regular attendance, being punctual, completing a normal work day and work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods,

accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers and peers without distracting them or exhibiting behavioral extremes.

(Tr. 45).  Mr. Utitis testified that such a person could not perform the jobs previously discussed—nor would that person be able to engage in any competitive employment.  (Tr. 45).  Plaintiff's counsel then asked, taking into account Dr. Sivak's description that she is "unable to consistently respond to directions, structure and instruction without significant anxiety, chaos, acting out and mood swings," whether she could sustain competitive employment.  (Tr. 45).  Mr. Utitis testified that such a person could not sustain full-time work.  (Tr. 46).

### E.  The ALJ's Decision

The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 18).  In reaching his decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient RFC to return to her past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  (Tr. 10); 20 C.F.R. § 404.1520(a)-(f).

At step one of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 3, 2008.  (Tr. 10).  Next, in analyzing step two, the ALJ found that Plaintiff had the following severe impairments: "Degenerative Disc Disease of the Lumbar Spine, Mood Disorder, Post-Traumatic Stress Disorder, Bipolar Disorder, Personality Disorder, and Polysubstance Abuse."  (Tr. 10).  With regard to her history of Hepatitis C, headaches, and cervical spine pain, the ALJ explained that there was no evidence in the record indicating that she sought significant treatment or "that they have more than a minimal

impact on her ability to perform basic work activities" and, as such, found that they were non-severe.  (Tr. 11).

At step three, the ALJ decided that Plaintiff did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1.  (Tr. 11-13).  Specifically, the ALJ considered the criteria of listings 1.04, 12.04, 12.08, and 12.09.  (Tr. 12).  With respect to listing 1.04, the ALJ found that "[a]lthough the objective medical testing indicated that the claimant has some disc degeneration, there [was] no evidence of pseudoclaudication and there [was] no indication of the claimant's inability to ambulate effectively"; thus he found that Plaintiff's impairments did not meet the listing 1.04. (Tr. 12).  With respect to listings 12.04, 12.08, and 12.09, after explaining the requirements necessary to satisfy "paragraph B criteria," the ALJ found that the Plaintiff had: (1) no restriction in activities in daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties with regard to concentration, persistence, or pace; and (4) no episodes of decompensation that have been for an extended duration.  (Tr. 12-13).  In so holding, the ALJ relied exclusively on Dr. Kang's psychiatric review and Mental Residual Functional Capacity and Plaintiff's testimony at the hearing regarding her daily activities.  (Tr. 12-13).  The ALJ did not discuss or appear to consider any evidence from Dr. Sivak, Plaintiff's treating psychologist within this section of his analysis.

Ultimately, because the ALJ did not find "two marked limitations [n]or one marked limitation and repeated episodes of decompensation, each of extended duration," he held that the "paragraph B criteria" was not satisfied.  (Tr. 13).  Additionally, he found that the evidence did not establish the "paragraph C" criteria.  (Tr. 13).[5]

---

[5] In the RFC section of his analysis (discussed below), the ALJ stated that he considered Dr. Sivak's opinion that Plaintiff "exhibited a marked degree of limitation in the areas of activities of daily living, social functioning and

Then, at step four of the analysis, the ALJ concluded that Plaintiff had the residual functional capacity [RFC] to perform work at a medium exertional level, as defined in 20 C.F.R. 416.967(c), so long as it was limited to simple, routine tasks with only occasional interaction with the public.  (Tr. 14).

In making this RFC determination, the ALJ employed a two-step process.  First, the ALJ asked whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms.  Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms was shown, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's ability to work.  If objective medical evidence did not substantiate the claimant's statements about intensity, persistence or symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of her impairments by considering the record as a whole.

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  (Tr. 14).  However, at the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment.  (Tr. 14).  He noted that although Plaintiff testified that she has no patience with people and a low level of tolerance for stress, one of her

---

concentration, persistence and pace and exhibited one or two episodes of decompensation, each of extended duration."  (Tr. 15).  The ALJ also took into account, with respect to "paragraph C criteria," Dr. Sivak's assessment that Plaintiff had "a mental impairment[] that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  (Tr. 15).  However, the ALJ afforded Dr. Sivak's opinions only "little weight" because "they conflict[ed] with the conclusions in the mental functional limitations report, are not supported by treatment notes and overstate the degree of severity of the claimant's mental impairments."  (Tr. 15).

treating physicians, Dr. Sivak, concluded that she would only occasionally be unable to "carry out very short and simple instructions, maintain attention and concentration for extended periods of time, or work in coordination with or proximity to others without being distracted by them and make simple work-related decisions."  (Tr. 14).

In determining Plaintiff's RFC, the ALJ considered the opinions of various physicians and afforded them various weight.  He afforded "some weight" to Dr. Woodrich's opinion that Plaintiff's medical history included chronic lower back pain, depression, PTSD, and probable bipolar disorder.  (Tr. 14).  He afforded "some weight" to Dr. Jeffrey Gorman's opinion that Plaintiff had the residual functionality capacity to perform work at the medium exertional level, provided in the Physical Residual Functional Capacity.  (Tr. 15).  He afforded "some weight" to the opinion of Dr. Kang, a state psychological consultant, that Plaintiff would have no problem following instructions and "will have minimal limitation in concentration and persistence to complete workdays and workweeks and will have substantial limitation in dealing with [the] general public, but [that] she can interact otherwise and her adjustment is minimally limited." (Tr. 15-16).

Relative to Plaintiff's RFC, the ALJ also considered and evaluated several of Dr. Sivak's opinions.  (Tr. 15).  He considered Dr. Sivak's opinion that Plaintiff would not be able to perform any employment in the foreseeable future, would be "frequently unable to understand and remember detailed instructions, would be occasionally unable to remember locations and work-like procedures, but would have only occasional difficulty in understanding and remembering short, simple instructions."  (Tr. 15).  He also considered Dr. Sivak's opinion that Plaintiff "would be occasionally unable to carry out very short and simple instructions, maintain attention and concentration for extended periods of time, work in coordination with or proximity

to others without being distracted by them and make simple work-related decisions."  (Tr. 15).
To these opinions, the ALJ gave them "some weight."

Finally, the ALJ provided that he considered the opinions of Marlin Trulsen, Ph.D. and
Matthew Harrison, M.D., that were made during psychiatric consultative examinations.  (Tr. 16).
Dr. Trulsen opined that Plaintiff's "general mental capacity for understanding [was] within
average range of ability," her "general mental capacity for remembering, following instructions,
sustaining attention, and concentrating appeared to be within an average to low average range,"
and her "general mental capacity to carry out work-like tasks with reasonable persistence or pace
[appeared] to be within a low average range and would likely improve towards an average range
with improved symptom profile management."  (Tr. 16).  Dr. Harrison opined that Plaintiff's
"ability to sit in an eight hour day [was] estimated at three to four hours in duration with breaks,
and that her range of motion at the low back reveal[ed] 80 degrees of flexion at the lumbar spine,
5 degrees of extension and side bending [at] 10 degrees bilaterally."  (Tr. 16).  The ALJ found
that these opinions were consistent with the residual functional capacity assessed.

Overall, the ALJ found that the residual functional capacity assessment was "supported
by the claimant's treating physicians, in part, and the state medical and psychological
consultants."  (Tr. 16).

Regarding Plaintiff's work history, the ALJ provided that Plaintiff had no past relevant
work.  (Tr. 16).  Thus, the ALJ proceeded to step five, and based on the testimony of the
vocational expert, found that "there [were] jobs that exist[ed] in significant numbers in the
national economy" that Plaintiff could perform taking into account her age, education, work
experience, and residual functional capacity.  (Tr. 17).  Specifically, the ALJ found that a
Plaintiff could perform the work of a hand packager or machine packager which, according to

the vocational expert, were classified as medium exertional level, unskilled, simple, routine repetitive jobs with no contact with the public.  (Tr. 17).

## II.   STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits.  There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401 et seq.).  "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be eligible for benefits, an individual's impairments must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence means more than a scintilla, but less than a preponderance.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009).  The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195 1199 (8th Cir. 1987)).  Rather, the court "must take into account whatever in the record fairly detracts from its weight."  Id.  (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id.

## III.   DISCUSSION

Plaintiff raises three distinct issues before the Court: (1) "The ALJ failed to evaluate the opinions of Dr. Sivak, the treating psychiatrist, in the manner required by law, and thus failed to give Dr. Sivak's opinions appropriate weight"; (2) The ALJ's decision that Plaintiff can perform work at the medium exertional level is not supported by substantial evidence on the record as a whole; and (3) The ALJ erred by failing to apply Rule 203.10 as a frame of reference." (Pl.'s Mem. in Supp. of Mot. for Summ. J. [Docket No. 9] at 17-27).

**A.  Whether the ALJ failed to evaluate Plaintiff's treating psychiatrist's opinion in the manner required by law**

Plaintiff first argues that "[w]hen evaluating the listings, the ALJ did not even mention Dr. Sivak's opinions indicating that a listing level impairment was present."  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 20).  Plaintiff is correct that in determining whether Plaintiff had an impairment or combination of impairments that met or equaled the listed impairments, the ALJ entirely failed to mention Dr. Sivak's opinion.  However, in making the residual functional capacity determination the ALJ specifically noted some of Dr. Sivak's findings in the assessment performed on August 31, 2010, and he discussed Dr. Sivak's opinion that Plaintiff's impairments met the listings.  The Court is required to read the ALJ's opinion as a whole, and although it would have been preferable for the ALJ to specifically discuss Dr. Sivak's findings in the listings analysis, limiting his discussion of Dr. Sivak's listings opinion to the subsequent residual functional capacity section does not constitute reversible error, in and of itself.  See Lewis-Leavy v. Barnhart, 109 Fed. Appx. 815, at *1 (8th Cir. 2004) (unpublished) ("reading the ALJ's opinion as a whole, we find that he made the requisite findings"); Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) ("[Plaintiff] is correct that it is preferable to have the Commissioner explicitly state the reasons why a claimant failed to meet a listing, but the conclusion may be upheld if the record supports it."); Carrington v. Astrue, 2008 WL 4462257, at *8 (W.D. Pa. Sept. 29, 2008) (explaining that the Court does not read the ALJ's findings "in a vacuum" and "[a]lthough the analysis of the medical evidence appears in places in the decision other than under the step three finding, the Court recognizes that it applies with equal force to that section."); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (explaining that the Eighth Circuit has "consistently held that a deficiency in opinion-writing is not a sufficient reason for

setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case").

Next, Plaintiff argues that the ALJ provided insufficient reasons for affording Dr. Sivak's opinion only "little weight."  The Court agrees.

Generally, more weight should be given to opinions from treating sources because they are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ."  20 C.F.R. § 416.927(d)(2); Hyland v. Astrue, No. 11-1793 (MJD/AJB), 2012 WL 1392959, at *8 (D. Minn. Apr. 2, 2012). However, "[a] treating physician's opinion 'does not automatically control or obviate the need to evaluate the record as [a] whole.'"  Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.2001)).  When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).  Thus, an ALJ may disregard a treating physician's medical opinion, and adopt the consulting physician's contrary opinion, when the treating physician's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole.  See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997).  If the treating physician's opinion rests solely on the claimant's complaints and is unsupported by objective medical evidence, the ALJ may appropriately give little weight to such an opinion. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).  Furthermore, the ALJ can also discount the treating physician's opinion if other assessments are supported by better, or more thorough,

medical evidence.  Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Rogers, 118 F.3d at

602.  In other words, the ALJ is not required to believe the opinion of a treating physician when,

on balance, the medical evidence convinces him otherwise.  Wagner, 499 F.3d at 849.

     Nevertheless, "[w]hether the weight accorded the treating physician's opinion by the ALJ

is great or small, the ALJ must give good reasons for that weighting."  Holmstrom v. Massanari,

270 F.3d 715, 720 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("whether

the ALJ grants a treating physician's opinion substantial or little weight, the regulations also

provide that the ALJ must 'always give good reasons' for the particular weight given to a

treating physician's evaluation."); see also Upchurch ex rel. Q.T. v. Astrue, 2008 WL 4104537,

at *17 (E.D. Mo. Aug. 29, 2008) (holding that the ALJ erred by according little weight to the

treating physicians' opinions that Plaintiff had marked limitations in three areas and instead

"relying on non-examining consultative examiners and his own interpretation of the medical

evidence").

     In the instant case, the ALJ afforded "some weight" to Dr. Sivak's opinion in the mental

functional limitations, but he provided no specific reasoning whatsoever for affording such a

limited weighting.  Also, with respect to Dr. Sivak's ratings in the "mental impairment severity

reports," which concluded that Plaintiff met the listing requirements," the ALJ afforded "little

weight" for three conclusory reasons: 1) they conflicted with Dr. Sivak's conclusions in the

mental functional limitations report; 2) they were not supported by treatment notes; and 3) they

overstated the degree of severity of Plaintiff's mental impairments.  (Tr. 15).  The Court

addresses each justification below.

     First, the Court disagrees that Dr. Sivak's mental functional limitations findings

conflicted with his ratings of Plaintiff's mental impairments severity.  (Tr. 15).  In describing Dr.

Sivak's assessment, with the exception of one, the ALJ cited only the findings pertaining to "occasional difficulty" and "occasionally unable," without referencing the other criteria which mostly fell within the "frequently unable" category.  (Tr. 423-25).  Thus, it is unclear that the ALJ took into account the majority of "frequently unable" categories when making his determination or whether, for whatever reason, he chose to discount them.  Taking into account Dr. Sivak's findings in the mental functional limitations report as a whole, they do not conflict with his ratings of Plaintiff's mental impairments severity report.  Moreover, other than his conclusory remark that the two reports conflict, the ALJ failed to provide any additional specific explanation or reasoning for his conclusion.  Thus, the Court finds that the ALJ's stated basis is conclusory and insufficient for affording Plaintiff's treating physician's opinion only "little weight."

Second, the Court disagrees, absent further explanation by the ALJ, that Dr. Sivak's ratings in the mental impairments report are "not supported by treatment notes."  (Tr. 15).  Initially, it is unclear whether the ALJ was referring to Dr. Sivak's treatment notes or the treatment notes of other physicians.  Reviewing Dr. Sivak's file notes, it is apparent that Dr. Sivak consistently diagnosed Plaintiff with post-traumatic stress disorder and bipolar disorder.  As early as 2005, he opined that Plaintiff would not be able to perform any employment in the foreseeable future, though that opinion did not provide much reasoning.  On November 24, 2008, when Plaintiff resumed her visits with Dr. Sivak, although he stated that Plaintiff's behavior seemed "[g]enerally in control," he assigned her a GAF score of 45, which would indicate serious symptoms or a serious impairment in social, occupational, or school functioning.  (Tr. 299-301).[6]  Likewise, Plaintiff's psychotherapist, Mr. Otterson, similarly diagnosed Plaintiff

---

[6] "According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of

with post-traumatic stress disorder and bipolar disorder and assigned her a GAF score of 45.  (Tr. 295).  The Court is mindful that Dr. Sivak and Mr. Otterson's file notes, as more fully discussed in the medical evidence section above, described times when Plaintiff's behavior seemed well-controlled.  It is undisputed, however, that Plaintiff lived primarily a sedentary life in which she rarely left her home and in which Plaintiff's primary activities were watching television and sleeping.  Thus, on occasions that her activities consisted of watching television and sleeping, she did not present with significant issues.  During the times that Plaintiff experienced any stress in her life, however, she presented in much worse condition.  (Tr. 349-52, 429, 435).  During these times of stress, Plaintiff was continually upset, her affect was continually labile or depressed, and Mr. Otterson, on one occasion noted that she "continued to be at significant risk for hospitalization."  (Tr. 433).  This is further supported by Dr. Sivak's finding that "even minor stresses in environment result in chronic severe anxiety and depression."  (Tr. 426).  On the record of medical evidence now before the Court, the Court cannot find that Dr. Sivak's findings in the mental impairments report are not supported by treatment notes in the record.  Because the ALJ once again failed to provide specific reasoning for his conclusion, or any citation to the record to support his conclusion, the Court finds that this basis, in the absence of further explanation, is insufficient upon which to afford Plaintiff's treating physician's opinion only "little weight."

Third, the Court finds that the ALJ's conclusory reasoning that Dr. Sivak "overstate[d] the degree of severity of [Plaintiff's] mental impairments," again without more detail or any citation to the record, is likewise insufficient upon which to afford the treating physician's

---

functioning.'" Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n.2 (8th Cir. 2003).  "GAF scores of 41 to 50 reflect 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" Id.; Duncan v. Astrue, No. 11-555 (MJD/JSM), 2012 WL 763566, at *15 n.11 (D. Minn. Feb. 14, 2012).

opinion "little weight."  Certainly, "[i]t is the ALJ's function to resolve conflicts among the various treating and examining physicians."  <u>Bentley v. Shalala</u>, 52 F.3d 784, 785 (8th Cir. 1995).  Here, however, the ALJ failed to provide whether he relied on the other physicians' conclusions for finding that Dr. Sivak overstated the degree of severity or whether he relied on Dr. Sivak's treatment notes (there is no citation to the record to support the former and the latter would be inconsistent with the ALJ's previous justification that the treatment notes did not support Dr. Sivak's conclusions).  The absence of any specific reasoning or citation to the record prevents the Court from meaningfully evaluating whether the ALJ acted properly when he discounted the opinion of Dr. Sivak.

Neither party disputes that based on Dr. Sivak's ratings in the mental impairment severity report, a finding of disability would be appropriate.  As the ALJ himself acknowledged, "[i]f the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement, the claimant is disabled."  (Tr. 10).  The ALJ's reasoning failed to provide the "good reasons for [his] weighting" and did not provide sufficient detail or citation as to why Dr. Sivak's ratings in the mental impairment severity report were entitled only to "little weight."  Furthermore, the ALJ appeared to rely solely on Dr. Kang, a non-examining consultant, in making the determination of whether Plaintiff's impairments met or medically equaled a listing.  Dr. Kang's opinion, however, was made in December of 2008, less than two months after Plaintiff's application date and, thus, did not take into account the full medical history of the Plaintiff which would include Dr. Sivak's and Mr. Otterson's treatment records from 2009 and 2010.  Moreover, it is likewise unclear why the ALJ decided to afford Dr. Sivak's findings in the mental functional limitations "some weight" but decided to afford Dr. Sivak's findings in the mental impairment severity report "little weight."  As already discussed,

absent some additional specific justification from the ALJ, the Court on the record before it cannot find that Dr. Sivak's reports and opinions were inconsistent, and the Court cannot be sure that the ALJ took into account the entirety of the mental limitations report (as part of the record as a whole) when making such a determination.  The ALJ's difference of weight in the two reports is particularly relevant in this case because the vocational expert, Mr. Utitis, testified that if Dr. Sivak's findings in the mental functional limitations report are taken into account, Plaintiff would not be able to engage in **any** competitive employment.  (Tr. 45).  On remand, the ALJ, after considering the entirety of the record, must provide specific and necessary "good reasons" and support for the weight he assigns to the various medical opinions pertaining to whether the "paragraph B" and "paragraph C" criteria are satisfied.

### B.  Whether the ALJ's decision that Plaintiff can perform work at the medium exertional level is supported by substantial evidence on the record as a whole

Plaintiff argues that the ALJ's conclusion that Plaintiff could perform work at the medium exertional level is not supported by substantial evidence in the record in light of Dr. Harrison's findings in his consultative examination that Plaintiff could only sit three to four hours in duration with breaks during an eight hour day and could only stand for approximately 15 minutes before feeling discomfort are supported by the record.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 23).

"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967 (c).  "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds."  Social Security Ruling 83-10.

Dr. Harrison's findings do not support a conclusion that Plaintiff cannot perform medium

work.  During the examination with Dr. Harrison, Plaintiff complained "primarily of her mental

health issues," and did "not make much of her low back complaints."  (Tr. 287).  She stated that

"she currently ha[d] no pain, at her worst she ha[d] no pain and at her best she ha[d] no pain."

(Tr. 287).  Although she informed Dr. Harrison that she believes she had "some osteoarthritis in

her lumbar spine," she "denie[d] any discomfort or deformity in any of her major joints or her

lower limbs."  (Tr. 287).  Upon examination, Dr. Harrison found that Plaintiff's range of motion

in the knees, hips, and ankles was all normal, she had "no evidence of enlargement effusion,

tenderness, swelling or any evidence of deformity of the lower limbs," her low back had no

evidence of deformity, and she was able to perform all stretch and reflex tests satisfactorily.  (Tr.

287).  Dr. Harrison did note that Plaintiff had some tenderness with deep palpation in the

paralumbar muscles.  (Tr. 287).

Dr. Harrison estimated that Plaintiff's ability to sit in an eight hour day was three to four

hours in duration with breaks, which Plaintiff agreed with.  (Tr. 287).  In stating that Plaintiff

could only stand 15 minutes before she would need to sit, Dr. Harrison did not cite to any data or

tests he performed to reach that conclusion, rather he appeared to base that statement purely on

Plaintiff's subjective complaint.  (Tr. 287).  Finally, he noted that Plaintiff had "some posterior

element arthropathy in the lumbar spine but [that] this [did] not cause significant limitation to

her."  (Tr. 288).  Overall, Plaintiff reported that she was not in pain, and Dr. Harrison's

examination revealed no significant limitations.

On December 29, 2008, Jeffrey D. Gorman, M.D., a state agency medical consultant,

made a physical residual functional capacity assessment of Plaintiff.  (Tr. 332).  He found the

following exertional limitations: occasionally lifting 50 pounds, frequently lifting 25 pounds,

standing or walking (with normal breaks) for a total of about 6 hours in an 8-hour workday,

sitting (with normal breaks) for a total of about 6 hours in an 8-hour workday, and no limitation

for pushing or pulling other than as noted in the other limitations.  (Tr. 333).  He found no

postural limitations, no manipulative limitations, no visual limitations, no communicative

limitations, and no environment limitations.  (Tr. 334-36).  He based his findings on Dr.

Harrison's examination performed on February 7, 2008.  (Tr. 333).  However, he reached a

different conclusion from Dr. Harrison because, according to Dr. Gorman, the conclusion

reached by Dr. Harrison "regarding standing was based entirely on the [history] given by

[Plaintiff]" and Plaintiff's "back exam was essentially normal except for some tenderness with

deep palpation in the paralumbar muscles."  (Tr. 338).  On April 16, 2009, Eames Sandra, M.D.,

a state agency medical consultant, affirmed Dr. Gorman's assessment.  (Tr. 356-58).

"Residual functional capacity assessments by non-treating physicians can constitute the

requisite substantial evidence."  Smallwood v. Charter, 65 F.3d 87, 89 (8th Cir. 1995).  Although

"the opinion of a non-treating, non-examining physician, standing alone, cannot constitute

substantial evidence, . . . when the opinion is one aspect of a record from which the ALJ draws

his conclusions and which substantially supports his findings, no error occurs."  Johnson v.

Astrue, No. 10-4373 (DWF/JJG), 2011 WL 7615112, at *15 (D. Minn. Dec. 15, 2011).

Here, Dr. Harrison's report noted that Plaintiff complained of no pain and that she had a

full range of motion.  Dr. Gorman's opinion appeared to only differ on the conclusion of how

long Plaintiff could stand.  Dr. Harrison's statement on the issue, as already discussed above,

however, appeared to be based entirely on Plaintiff's subjective report and was not supported by

any objective medical data.  As such, Dr. Harrison's opinion on the issue did not need to be

accepted by the ALJ.  See Woolf, 3 F.3d at 1214 (explaining that if the treating physician's

opinion rests solely on the claimant's complaints and is unsupported by objective medical evidence, the ALJ may appropriately give little weight to such an opinion); Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996); Britton v. Astrue, 2010 WL 3825480, at *17 (E.D. Mo. Sept. 24, 2010) ("while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data.").

Dr. Harrison's observations that Plaintiff had some tenderness with deep palpation, in light of the other overwhelmingly normal objective findings, do not constitute substantial evidence in the record that Plaintiff could only stand for 15 minutes before having to sit. Additionally, contrary to Plaintiff's argument, the 2004 x-ray which showed some degenerative disc degeneration between L4-5, mild spurring and some facet spurring in the lower lumbar spine does not constitute substantial evidence in the record to support a conclusion that Plaintiff was so severely limited in the duration of her ability to remain standing.  Additionally, the x-ray report from 2004 objectively provided that all other findings were essentially "negative." Furthermore, Dr. Harrison, with the exception for standing noted above, made normal findings during his examination regarding Plaintiff's mobility.  She herself reported no pain at the time and complained primarily of her mental health issues.  Moreover, other than the limited examination by Dr. Harrison in February of 2008 and the x-ray in 2004, both of which were prior to Plaintiff's present application for disability filed in November of 2008, there is an absence in the record of any findings, or complaints, that Plaintiff suffered from continued lower-back pain, which serves to discredit Plaintiff's subjective complaints that she could only stand for 15 minutes.  See Martin v. Astrue, 2011 WL 3352462, at *16 (E.D. Mo. Jul. 15, 2011) ("[t]he absence of ongoing medical treatment is inconsistent with subjective complaints of pain.").

Because the ALJ appropriately resolved any conflicts among the various physicians and the record as a whole supports the ALJ's findings, there was no error. See Johnson, 2011 WL 7615112, at *15.

**C. Plaintiff does not satisfy the requirements of Rule 203.10 in this case and the ALJ did not err in his analysis.**

Rule 203.10 of the Medical/Vocation Guidelines provides that in the absence of any relevant work experience, when the person is over the age of 55 and is restricted to a medium exertional level, with a limited education or less, "a finding of disabled is appropriate." 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 203.10. When the same person is a high school graduate or more, however, a disability finding is not required. 20 C.F.R. Part 404, Subpart P, App. 2, Rule 203.14.

Plaintiff concedes that she does not "precisely fit" within Rule 203.10, but she argues that the ALJ erred by not using it at least as a frame of reference. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 27). She essentially argues that because her impairments prevent her from doing work that requires a high school degree, she is closer to the situation "described in Rule 203.10 than Rule 203.14." (Id.) Plaintiff also asserts that "[t]here is no indication in the decision that the ALJ considered applying Rule 203.10 as a frame of reference." (Id.)

At the hearing, Plaintiff's counsel asserted that Plaintiff met the qualification of Rule 203.10, but the ALJ explained that the rule also has a requirement of "limited or less education." (Tr. 25). After noting that Plaintiff had a GED, Plaintiff's counsel stated, "You're right. Okay. So it's more than limited." (Tr. 25).

Limited education, the requirement under Rule 203.10, is defined as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational

qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs."

20 C.F.R. § 404.1564(b)(3).  It is generally considered that "a 7th grade through the 11th grade

level of formal education is a limited education."  <u>Id.</u>  A General Equivalency Degree (GED), as

its name implies, is considered the equivalent of a high school education.  <u>See</u> <u>Roberts v. Astrue</u>,

2011 WL 4711916, at *11 (D. Neb. Oct. 6, 2011) (finding that a "GED recipient has attained the

educational development and abilities of the typical high school graduate" and rejecting

Plaintiff's argument that she fit the definition of "limited education" even though she had a

GED); <u>Soutiere v. Betzdearborn, Inc.</u>, 189 F. Supp.2d 183, 185 (D. Vt. 2002) (explaining that a

GED is "the equivalent of a high school education").  The Court finds that the ALJ did not err by

not finding Plaintiff disabled on the basis of Rule 203.10.

      Plaintiff's argument that the ALJ specifically needed to state that he was at least using the

rule as a frame of reference is equally unavailing.

> Where the findings of fact made with respect to a particular individual's
> vocational factors and residual functional capacity coincide with **all** of the criteria
> of a particular rule, the rule directs a conclusion as to whether the individual is or
> is not disabled. . . . Where any one of the findings of fact does not coincide with
> the corresponding criterion of a rule, the rule does not apply in that particular case
> and, accordingly, does not direct a conclusion of disabled or not disabled. In any
> instance where a rule does not apply, **full consideration must be given to all of**
> **the relevant facts of the case** in accordance with the definitions and discussions
> of each factor in the appropriate sections of the regulations.

20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 200.00 (emphasis added).  Here, the ALJ specifically

considered Rule 203.10 during the hearing, considered the relevant facts of the case in

determining Plaintiff's residual functionality capacity, (<u>see</u> Tr. 14-16), and stated that he

specifically considered Plaintiff's "residual functionality capacity, age, education, and work

experience in conjunction with the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart

P, Appendix 2" and Social Security Ruling 83-14.  (Tr. 17-18).

For these reasons, the Court finds that the ALJ committed no reversible error in not specifically citing to Rule 203.10.

**IV.  CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1) Defendant's Motion for Summary Judgment [Docket No. 14] be **DENIED**; and

2) Plaintiff's Motion for Summary Judgment [Docket No. 8] be **GRANTED** in part as more fully described above; and

3) The case be remanded for further proceedings consistent with this Report and Recommendation, pursuant to Sentence Four of 42 U.S.C. § 405(g).


Dated: August 6, 2012                                      s/Leo I. Brisbois
                                                           LEO I. BRISBOIS
                                                           United States Magistrate Judge


**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by August 20, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.